[Civ. No. 5876. Fourth Dist. Aug. 5, 1959.]

STANLEY TRUSSELL et al., Respondents, v. CITY OF SAN DIEGO, Appellant.

594

J. F. DuPaul, City Attorney, and Alan M. Firestone, Chief Deputy City Attorney, for Appellant.

Swing, Scharnikow & Staniforth, Phil D. Swing and C. H. Scharnikow for Respondents.

HAINES, J. pro tem.*—Santa Ysabel Creek, also known as the San Bernardo River, rises on the westerly slope of Volcan Mountain, in San Diego County, at an elevation of upwards of 5,500 feet and flows in a direction generally southwesterly to its junction with Santa Maria Creek, coming in from the south, below which the combined stream is known as the San Dieguito River which thereafter pursues its course in the same general direction to the Pacific Ocean. This it reaches between Solano Beach and Del Mar at a point about a mile north of the latter. There are several other tributary creeks which join these waters at various points. The terrain through which these streams flow consists of a series of canyons and narrow valleys of which the most important are San Pasqual and San Dieguito. It is with the former that we are here concerned.

The original plaintiffs herein were Stanley Trussell, Lucille M. Trussell, Franklin Trussell, Jane L. Trussell, May Rhodes Trussell, Frank E. Judson, Velda C. Judson, Alice M. Judson Suhrie, Charles A. Judson, Rebecca T. Judson, Rebecca P. Judson Dyer, Bernice J. Judson Morrisey, Fred A. Dyer, Erwin C. Georgeson, Lydia A. Georgeson, Harold W. Pfeiffer, Helen L. Pfeiffer, Southeastern California Association of Seventh-Day Adventists, a corporation, Ralph Cook and Jeanne V. Cook. They were, on May 1, 1956, the date of the commencement of this action, respectively owners of lands particularly described in the complaint, all within

_____
*Assigned by Chairman of Judicial Council.

the San Pasqual Valley. They continue respectively to own, occupy and in part to cultivate the lands so described, except as some of them have since disposed of their properties to defendant and appellant city of San Diego, and withdrawn from the case; and except also as plaintiffs and respondents Stanley Trussell and Lucille M. Trussell, husband and wife, in addition to occupying and cultivating certain of their own lands have at various times leased and cultivated lands belonging to others of the plaintiffs; and except also as the plaintiffs Frank E. Judson and Velda C. Judson, in addition to occupying and cultivating certain of their own lands, have leased and cultivated the land owned by plaintiff Alice M. Judson Suhrie.

The San Pasqual Valley includes about 6,000 acres altogether, of which, at the commencement of the action the portions owned and farmed by the plaintiffs aggregated approximately 1,600 acres, forming the community known as East San Pasqual. Of the rest of the 6,000 acres the greater part have been acquired by appellant city of San Diego. These, for the most part, lie downstream from respondents' properties. According to respondents' engineer, Cromwell, about 360 acres of respondents' lands are in fact irrigated. These include orchards and areas devoted to raising grain, corn and alfalfa. The evidence shows that respondent Stanley Trussell, on his property and that which he and his wife lease are conducting and for many years have conducted an extensive dairy business, requiring for its successful conduct large quantities of water. Other respondents are also maintaining dairies.

The valley and the respondents' lands are underlain by sands and gravels across which the river flows and which form an underground basin. The plaintiffs and respondents, except for such rain as falls on the valley floor, obtain their water supply from the river, which, at the locations of their lands, is not a perennial stream but flows irregularly from negligible discharge in some summer seasons to occasional torrential floods during protracted winter storms. Neither the river nor the creeks tributary to it, except in their upper reaches above the areas with which we are here concerned, flow, through the drier parts of the year, on the surface, but, so far as they continue at all, do so by percolating the sands and gravels which underlie their beds. The percolations of the river, however, in a state of nature, extended beyond the bed of the stream and sunk into the alluvium

of the valley, filling the underlying sands and gravels to the full width of the valley and underlay all of the respondents' lands, all of which were found by the trial court to be riparian to the river itself and all of which were also found by the court to be lands overlying the impregnated basin. These lands are supplied by wells whenever surface flow from the river is not available.

Besides their riparian and overlying rights, respondents, except for the Cooks, are found by the trial court to each own a share in certain appropriative rights in the waters of Santa Ysabel Creek, initiated by their predecessor in interest in 1876 and perfected and put to beneficial use by their predecessors in interest long prior to the year 1913, and ever since exercised by the respondents (other than the Cooks) and their predecessors to the full extent of their requirements, on the said lands owned by them, whenever the water was available in the stream at their point of diversion, which was at the head of the San Pasqual Valley. It is found, however, that in recent years the diversion of water thus appropriated and used on respondents' lands has not, at any time, exceeded 12 cubic feet per second.

According to the findings, defendant and appellant city of San Diego, pursuant to a state permit dated June 30, 1950, constructed the Sutherland Dam on Santa Ysabel Creek at a point some miles above the San Pasqual Valley and above the point at which plaintiffs and respondents divert the appropriated water. The record shows that this permit was made subject to all vested rights. The dam is built at an approximate stream bed elevation of 1,900 feet above sea level. It was commenced in 1952 and was substantially completed and its diversion outlet closed on December 30, 1953, although it is admitted in the pleadings that its full completion did not occur until June, 1954. This dam has impounded, stored and retained all water originating in the watershed above the same, amounting to 7,604 acre feet from January 1, 1954, to June 30, 1957, of which 4,757 acre feet was the inflow for the year 1953-1954, 733 acre feet in 1954-1955 and 910 acre feet in 1955-1956. It is found that all of said water so stored was needed by plaintiffs and respondents to supply their reasonable needs on their lands and that there was not at any of said times any surplus available for appellant city to store or use. It is found that, in consequence of the withholding by appellant city of such stored water, the static water level in the wells of plaintiffs and respondents went down from

approximately 10 feet below the ground surface before the construction of the dam to 44 feet after the dam was completed. It is found that the 10-foot static level referred to was due to an exceptionally wet year in 1952, but that the average static level in respondents' wells prior to construction of the Sutherland Dam ranged from 12 to 20 feet below ground level, and that this range is required to enable respondents to operate their wells as they have been accustomed to operate the same. It is further found that the withholding by defendant and appellant city of San Diego of such stored water has caused the water table beneath the lands of plaintiffs and respondents to fall below the root systems of their trees, orchards and alfalfa, thus requiring respondents to irrigate their trees, orchards, and alfalfa more frequently than they otherwise would have had to do, thereby increasing their labor costs and pumping costs; also that the water from their wells was of poorer quality than the surface flow which they had previously obtained at the head of the valley in this, that such surface flow was warmer and carried silt which fertilized their lands. It is also found that by reason of the lowering of the water table respondents were unable to obtain their requirements from their respective wells without the expenditure of substantial sums for new wells and new equipment.

It is found that respondents have employed no unreasonable method of use or unreasonable method of diversion of water nor wasted any water.

The trial court further found that of the losses incurred, expenditures made and damages suffered by respondents in consequence of their impaired water supply, 50 per cent was due to causes unconnected with appellant city's operations, principally the current severe and protracted drouth, but that the other 50 per cent was the direct and proximate result of appellant city's construction and operation of the Sutherland Dam and the withholding back of it of the waters of the Santa Ysabel Creek originating in the watershed of the latter.

Copies of claims seasonably filed by respondents with the city of San Diego for the damages resulting from the construction and operation of the Sutherland Dam are attached to the complaint and made part of the same as exhibits and the due receipt by the city of these claims is admitted.

The trial court found the amounts of many of the various classes of damages sustained by the several respondents and

also found that appellant city of San Diego will, unless restrained, continue its present policy of withholding behind the Sutherland Dam all of the water of the Santa Ysabel Creek originating above the dam, to the continued injury and damage of respondents and their lands.

The record shows that the plaintiff and respondent Stanley Trussell in January, 1954, in behalf of himself and others interested, interviewed the city manager of the city of San Diego with a view to working out an arrangement whereby the landowners in the San Pasqual Valley might be assured that their water rights would be safeguarded when the Sutherland Dam should be completed and placed in operation and that a written communication was addressed to the city manager by Mr. Swing as a representative of such landowners under date February 25, 1954, seeking a conference to effect such arrangement, and that such conference was held on April 14, 1954. It further appears that on April 22, 1954, respondents' attorneys addressed a letter to the city manager complaining of the decreased flow then experienced by respondents at respondents' diversion ditch at the head of the San Pasqual Valley due to the obstruction of the runoff upstream resulting from construction work on the dam. This letter recites an inspection on the ground with a representative of the city and the exhibition to him of a photostat of the 1876 appropriation filing. The letter requests immediate restoration of the normal flow below the dam. The record further shows that on July 23, 1954, pursuant to the authority of a resolution adopted on the previous day by the San Diego City Council, the city of San Diego through its city attorney entered into a written stipulation with respondents' present counsel reciting the foregoing contacts and agreeing, *inter alia,* that ''The respective rights of said parties or any of them will not be in any way impaired, prejudiced or lost by lapse of time or delay subsequent to January 30, 1954, in commencing or instituting any legal action or proceeding in the filing of any claim for damages on account of or based upon or arising out of the storing by the City of San Diego of water behind the Sutherland Dam and/or the construction of said Sutherland Dam and/or the diversion of the water impounded by said dam out of the watershed above it.''

This stipulation recites that:

''The purpose of this agreement is to maintain the status quo of the rights enjoyed by the parties hereto as of January

30, 1954, while negotiating for an agreement of settlement or compromise."

This stipulation is set up in the complaint and a copy attached as an exhibit thereto, and its existence is recited in the findings.

The trial court also found that the respondents at the time they filed their claims against the city of San Diego and at the time they filed their complaint herein "had no actual notice or knowledge of the city's plans and intentions on what its policy would be with reference to limiting its storage of Santa Ysabel Creek water back of the Sutherland Dam, solely to the excess and surplus over and above plaintiffs' reasonable requirements, and for that reason they filed a second cause of action to their complaint alleging permanent damages. However, defendant city in its answer denied that it had appropriated to its own use, profit and enjoyment all the waters of Santa Ysabel Creek originating above said dam and denied any permanent injury or damage to plaintiffs or their respective lands. There was no evidence introduced by either party on the subject of permanent damages but the case was tried on the theory that permanent damages were not an issue before the court. Accordingly, no finding is necessary on the second cause of action set out in plaintiffs' complaint, and none will be made."

The court found also that there was no diversion from the Sutherland reservoir until about March 26, 1954, "when water from the Sutherland Dam was, for the first time, diverted through a tunnel into the San Vicente Reservoir of the City of San Diego, in order to test the newly constructed Sutherland tunnel and diversion works."

As conclusions of law the trial court determined that the respondents (except Harold W. Pfeiffer and Helen L. Pfeiffer who *pendente lite* had disposed of their lands) were "owners of rights in and to the waters of the Santa Ysabel Creek prior and paramount to the appropriative rights of the defendant City of San Diego"; that the respondents were entitled to judgment for damages against the city as set out in the findings; that the respondents were entitled to have the water levels in the wells restored so as to range between 12 and 20 feet below the ground surface; that appellant city is not entitled to withhold or store the natural flow of Santa Ysabel Creek when the average static water level under respondents' lands and in their wells falls below 20 feet below the surrounding ground surface and that "there has been no

such public use made of any of the water stored in or diverted out of Sutherland reservoir to an extent sufficient to deter this court from granting appropriate injunctive relief; furthermore, even if some public use had been made of some of said waters, defendant would not be and is not entitled to assert a claim of public use because of the stipulation" aforesaid.

The trial court proceeded to enter judgment in accordance with its findings and conclusions of law awarding both damages and injunctive relief as therein contemplated. The city has appealed from the judgment.

Pending the appeal the respondents Frank E. Judson, Velda C. Judson and Alice M. Judson Suhrie have reached a settlement with appellant city and the appeal has as to them been dismissed. We have, then, to consider the merits of the appeal as between the remaining respondents and the appellant city.

Appellants claim (1) That the damages awarded the respondents are excessive; and (2) That the respondents should have been denied injunctive relief.

The trial court heard a mass of testimony relative to the monetary detriment suffered by the respective respondents for the years 1954, 1955 and 1956 from the impairment of their water supply, resolving such conflict as there was in the evidence on the subject in reaching its conclusion. The principal industry in the San Pasqual Valley is dairying. The care of cattle requires large quantities of water. To feed them, moreover, alfalfa and corn are grown in considerable quantities. The testimony of various respondents as to their individual efforts to obtain water through the sinking of additional wells and as to what their crops have been from year to year fills many pages of the voluminous transcript, but records were not kept of the exact acreages devoted by particular growers in particular years to particular crops. Although it is clear enough that there has been, during the years 1954, 1955 and 1956, large monetary damage in the valley from water shortage the matter of reducing it to definite figures is no simple task. Respondents' witness Cromwell, who qualified as an expert, not merely as an engineer but also in the practice of applying water to crops, made the estimate of crop damage and additional costs of producing crops, due to water shortage, on which in part the trial court based its damage awards. On direct examination he was allowed without specific objection to give his estimates of the damage suffered by each respondent. On cross-examination it de-

veloped that he reached his figures of crop damage by applying a uniform formula throughout the valley. Taking alfalfa as a typical crop he figured that, as compared to what would be expected had a sufficient water supply been available, there was for each acre of alfalfa land, a loss in 1954 of half a ton of alfalfa, for 1955 a loss of a ton of alfalfa, and for 1956 a loss of a ton and a half of alfalfa. He treated alfalfa through the period involved as worth $35 a ton. He assigned particular acreages to each of the respondents as the area irrigated in a given year by each and, treating the acreage assigned to each as though entirely devoted to alfalfa, he computed the crop damage of each respondent by applying the above formula. He testified that the figures for corn would be substantially the same as for alfalfa and attempted no particularization for other irrigated crops. He added for each respondent for 1954, $8.00 per irrigated acre, for 1955, $12 per irrigated acre and for 1956, $21 per irrigated acre as increased cost of labor, fuel, etc. involved in pumping by reason of the progressive lowering of the water table and the inability to get water from the ditch diversion. He also added any cost incurred in the case of the individual respondent for new equipment or well digging required by water conditions. His totals, thus arrived at, were adopted by the trial court in those instances in which the testimony given by individual respondents or other witnesses, did not, in the court's opinion, supply adequate data for fixing the amount of a particular respondent's damages, or where in its opinion Mr. Cromwell's estimate appeared to be the more reliable. The court, having reached its conclusion as to the total damages suffered by each of the several respondents proceeded to divide it by two on the theory that 50 per cent of the damages was attributable to the prolonged drouth and the other 50 per cent to appellant's withholding of water, and treated the result as, in the case of each respondent, the loss suffered by him from appellant's operations. The resulting figures are the basis of the awards of damages determined in the findings and contained in the judgment.

■ Appellant complains of the whole basis on which Cromwell's estimates are made as speculative and unreliable. Particularly does it instance the award made to the Southeastern California Association of Seventh-Day Adventists. This religious corporation, between 1947 and 1950, according to the testimony of Mr. Ambs, a member of its governing board, acquired lands, now amounting to 238 acres, in the San Pasqual

Valley and established there an academy for young people for whom a rural atmosphere was desired, including incidentally training them in agricultural pursuits. The inducing motive in selecting this locality according to Ambs was the apparently abundant water supply. The witness Juler, who, from 1953 to 1956, served as a member of the school faculty and as its book-keeper, testified that the academy maintains extensive plant-ings of lawns and shrubbery about its buildings. At the time he came there it had two orange groves, 2 or 3 acres in lemons and an avocado grove. There have been no other further plantings of fruit trees. The school maintains a dairy, not as a commercial enterprise but for its own use. From time to time the number of milk cows varies. It had 52 in 1953 and the same number in 1956, with 62 younger stock. The crops grown have been mainly devoted to feeding the cattle. In 1953 there were produced 256 tons of corn, 178 of green chop and 118½ of dry hay; in 1954, 220 tons of corn, 466½ of green chop and 13 of alfalfa hay; in 1955, 300 tons of corn, 736½ of green chop; and in 1956, 237 tons of corn and 1,285¼ of green chop, but no hay. There has been, from time to time, some oats grown and some sudan grass. Juler has no record of the exact acreage from time to time devoted to each class of crop. The witness Weaver, principal of the academy, testi-fied that generally through the period involved there has been some increase in the quantity of produce. He attributed it to increased fertilization. Both he and Ambs emphasized the increasing insufficiency of the water supply. Mr. Weaver testified to the uncertainty in planning for the continuance of the school or for increased enrollment in consequence of the shortage of water. According to respondents' engineer, Crom-well, 176 acres of the academy holdings are actually culti-vated. The rest is arable but not irrigated. The item claimed in the complaint and allowed this respondent for diminished crops resulting from water shortage was computed by Crom-well. The diminution is not actual but a dimunition in what he claims ought to have been expected. He testified that he took as a basis only 100 acres of the academy's total cultivated area, this being the part of the area susceptible of irrigation from the diversion ditch when in use. To this 100 acres Cromwell applied the formula above mentioned. According to appellant, there should have been no award for crop damage at all to this respondent, since during the period of drouth its crops have increased rather than diminished. It is apparent, however, that the above figures for crops taken

off this land do not tell the whole story. According to Cromwell the greater part of its irrigated area is in alfalfa. Since only 13 tons of alfalfa hay appear to have been taken off of it in 1954 and none in the two following years it may be assumed that the alfalfa was grown for pasturage rather than to harvest it. The fact that an increase was had in the quantity of certain other crops, particularly green chop, would not necessarily negative a loss, as compared with what in normal conditions should have been expected in the alfalfa crop.

It must be conceded that the basis adopted by the trial court in computing respondent's damages leaves much to be desired in respect of exactitude but Mr. Cromwell's testimony went in practically without objection and appellant did not move to strike it out. It was, therefore, there to be weighed. The trial court, while recognizing the difficulties which it presented, was in part guided by it.

Cromwell, *inter alia,* stated that the watershed area behind the Sutherland Dam constituted approximately 50 per cent (actually 53%) of the total watershed area upstream from respondents' properties. This statement appellant in its opening brief concedes, so far as it concerns this watershed area, to be substantially correct.

Appellant's engineer, Crooker, who also testified at the trial, undertook to estimate the relative effects of the drouth and of the withholding of water in the Sutherland Dam upon respondents' water supply by a study of the effects of the drouth on other lands not affected by the withholding of water at the dam, and concluded that only 16 per cent of the drop in the subsurface water level beneath respondents' lands was due to the withholding of water by the city. Whatever weight is to be given to Mr. Crooker's testimony, however, it must still be borne in mind that the respondents do not rely exclusively in their claim for damages on the lowering of the water table beneath their lands. They rely also on the circumstance that they can no longer for as long a season or in adequate quantities obtain water from their diversion ditch which formerly, for much of each year, furnished their most convenient and least expensive means of obtaining water and applying it to their lands. The trial judge recognized the difficulty of exactly apportioning the whole detriment to respondents between that caused by the city's action and that caused by the drouth. The evidence would not justify us in disregarding the trial court's conclusions on the subject nor in treating them as arbitrary nor in disturbing the por-

tion of the judgment which fixes the amounts of the damages awarded against appellant city. The trial judge in his memorandum opinion pertinently noted the suggestion made in *California Orange Co.* v. *Riverside Portland Cement Co.,* 50 Cal.App. 522, 525 [195 P. 694], quoting from *Washburn* v. *Gilman,* 64 Me. 163 [18 Am.St.Rep. 246], that:

"The difficulty may be great of accurately proportioning and assessing the damage done by the defendant, but that difficulty the defendant could have avoided had he taken care that no occasion should arise requiring such assessment of damages."

We come, then, to the more serious question whether the injunctive relief granted respondents against appellant city can be sustained. The trial court found that all of the lands of the respondents are riparian to the stream and overlying the basin into which its waters spread. Appellant's counsel urge that the maps show that some of such lands do not abut the river. The point is not material, for even if some portions of them do not border the river bank, the evidence and the findings make it clear that all overlie the underground water-bearing basin, whence it follows that all have at least overlying rights, which, for all purposes with which we are here concerned, are the equivalent of riparian rights. Moreover except for the respondents Cook, who acquired their holdings after the Sutherland Dam enterprise had been initiated, all of the respondents are successors in interest of appropriators whose rights, as such, date from 1876, and such appropriative rights have been, at least to the extent of 12 cubic feet per second of flow, exercised thence hitherto, whenever there was any sufficient surface flow in the river, except as their exercise had been interrupted by appellant. There can be no question that all of respondents' water rights, both riparian, overlying and appropriative are prior and paramount to the rights of appellant city. Now, not only have respondents' riparian and overlying uses of the river water been invaded, but respondents' appropriative use of such water has been, during parts of the former season of surface flow of the river, wholly suspended, and for the rest of such former season partially suspended by appellant's action.

In *Tulare Irr. District* v. *Lindsay-Strathmore etc. District,* 3 Cal.2d 489, 525 [45 P.2d 972], it is said that:

"If the riparian is putting the water to any reasonable beneficial uses, it is now necessary for the trial court to find

expressly the quantity so required and so used. A finding, such as that in the present case to the effect that the riparian requires a 'reasonable' amount for such uses, under the new doctrine, is clearly insufficient and a judgment based thereon must be reversed. ■ The trial court, under the new doctrine, must fix the quantity required by each riparian for his actual reasonable beneficial uses, the same as it would do in the case of an appropriator. The new doctrine not only protects the actual reasonable beneficial uses of the riparian but also the prospective reasonable beneficial uses of the riparian. As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises. Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator.''

The appellant insists that for failure to define the extent of respondents' reasonable use of water as required by the rule thus laid down, the case must be reversed. Contrariwise, the trial judge in his opinion (Clerk's Trans. p. 88) stated that:

''Since the 1928 Amendment to the Constitution of California, our courts have been rejecting the idea that the decree should fix a definite amount of water measurable in second feet, acre feet or miner's inches to any particular parcel of land. . . . Instead of fixing definite amounts of water to be supplied, the courts have been requiring the party at fault to maintain the water level in the injured parties' wells at a certain point.''

The first sentence of this language is taken almost verbatim from the opinion of the United States District Court for the Southern District of California in *Rank* v. *(Krug) United States*, 142 F.Supp. 1, 166, where the court cites in support of it *City of Lodi* v. *East Bay Municipal etc. District*, 7 Cal.2d 316 [60 P.2d 439] and *Stevinson Water District* v. *Roduner*, 36 Cal.2d 264 [223 P.2d 209]. These last two cited cases seem to us, however, rather remote in their bearing on the requirement laid down in the Lindsay-Strathmore case.

Curiously enough, though both the federal court in *Rank* v. *(Krug) United States*, and the trial court in the instant case, cited the Lindsay-Strathmore case in other connections, neither appears to have noted the above-quoted passage therefrom as respects the point now under discussion. We are unable to find that as respects the requirements laid down in

the above quotation from the Lindsay-Strathmore case, that decision has ever been overruled or disapproved, where clearly applicable. We do find, however, that in the case of *Corona Foothill Lemon Co.* v. *Lillibridge,* 8 Cal.2d 522 [66 P.2d 443], the field of its applicability has been significantly restricted. The Supreme Court in the last mentioned case observed that there was not involved an action to quiet title to a water right. Neither, for that matter, is the case before us here an action to quiet title. The test, however, actually applied, though not fully expressed in the Lillibridge opinion, as to the applicability in a given instance of the rule laid down in the Lindsay-Strathmore case seems to us to have been a more fundamental test, namely, whether or not the application of the rule of the Lindsay-Strathmore case, in a particular instance, would or would not be *useful.* In the Lillibridge case the court held it apparent from the outset that there was no surplus of water in the source of supply over the reasonable needs of the party having the prior right, for any subsequent appropriator. It held, therefore, an accurate measurement of such paramount needs would be useless and, therefore, not required. There could manifestly be no surplus to be appropriated and no measurement was there needed to so determine. In some cases we can see that the application of the Lindsay-Strathmore rule might well be useful and therefore mandatory as in the case of a perennial stream, where the question is merely one of dividing a fairly stable flow between one having a prior right, whose beneficial use of water tends to be much the same for a considerable period. and a subsequent appropriator. There, by ascertaining the quantum of the reasonable beneficial use of the party having the prior or paramount right, the part of the flow left for appropriation can, with reasonable approximation, be determined. On the other hand, it is evident from the opinion in the Lillibridge case that where the application of the Lindsay-Strathmore doctrine would be of no practical utility it will not be applied.

In the case at bar, so far as the appropriative rights of respondents are concerned, the trial court has already determined their extent, to wit, 12 cubic feet of flow per second whenever there is that much surface water in the stream. That quantity is obviously being devoted to reasonable beneficial uses and, as respondents share a single appropriation and a single diversion, the determination of their appropriative right *in solido* is the only quantitative determination practicable or useful. For the determination in the circum-

stances of this case, however, of the specific quantities of the reasonable current needs of each of the riparian or overlying owners, as such, who are respondents here, it is difficult to find any utility. On the other hand, such determination could hardly remain effective for any appreciable length of time, since, in the main, respondents are not merely irrigating only a fraction of their arable lands, but there is every probability that more and more of the same will come under cultivation as time goes on, if only there is enough water. On the other hand, there is no direct proportionate relation between any ascertainable quantity of water devoted by respondents at a given time to reasonable beneficial uses and the releases at Sutherland Dam necessary to meet their needs. The San Dieguito River is not a perennial stream. Its flows are subject to wide seasonal, annual and cyclic variations. The excess flows of one season for one year or one cycle have to be relied on to charge the strata from which respondents' wells are fed. It cannot be said that respondents' need for reasonable use on their lands aggregate a given quantity of water per annum and that all the rest that originates above them in the Santa Ysabel watershed is surplus over what needs to be released during any given period at Sutherland Dam. That would be a hopeless oversimplification of the problem. Required releases must have relation to long term needs. The situation is further complicated because there is the question of how much water may, at a given time, be available from tributaries of the San Dieguito other than Santa Ysabel Creek. Respondents are not only entitled to receive the amounts of their reasonable requirements but they are entitled to have the water table in the San Pasqual Valley maintained at such levels that they can get their water without unreasonable expense.

Our conclusion is that there do not exist in the instant case the conditions which would give the requirements laid down in the rule above quoted from the Lindsay-Strathmore case any useful application here and, therefore, that it was not error for the trial court to refrain from undertaking to find in acre feet or other units of measurement the exact reasonable requirement of each of respondents for the satisfaction of his riparian or overlying rights.

Since the amendment of 1928 by adding section 3 to article XIV of the state Constitution, respondents' riparian and overlying rights have of course been, as their appropriative rights always were, subject to the requirement that their

use be reasonable and also that the manner of their use be reasonable and not wasteful. The trial court has, in the instant case, found that these conditions have been complied with. As respects the respondents' use of riparian and overlying rights, whatever their exact measurement may be, we see no ground on which this finding can be attacked. There is no evidence that any respondent in exercising his *riparian* or *overlying* rights has ever pumped from wells more water than his reasonable needs have required and certainly the fact that he has to go ever deeper to get his water is not a circumstance to induce prodigality in its use. Nor has any decision been cited to us to the effect that the doctrine that a riparian or overlying owner must be confined to a reasonable use of water requires him, for the benefit of a new appropriator, to submit to the indefinite lowering of his water table and the consequent indefinite increase in his pumping costs. How high its level must be maintained to assure him the reasonable use of his riparian or overlying right without unreasonable cost is in each case a question of fact for the trial court. There is no evidence here, either, that respondents, in the exercise of their *appropriative* rights, have been making substantially excessive or wasteful consumptive use of water. There is, indeed, some suggestion of weed growth in their open diversion ditch but that is a minor detail and a certain amount of that sort of thing would be unavoidable unless they were to go to large expense in completing the cementing of the ditch. The evidence does show that any loss from weed growth is largely minimized by cleaning the ditch each fall before the flow into it begins, as well as at other times, and also in that, downstream from diversion point, the water is ultimately carried into a pipe line. Both above and below its intake service laterals are run. The principal complaint with respect to respondents' diversions, however, is the inefficiency of their diversion dam. This is merely an obstruction supported at its river bank end by a wooden framework but in its outer portions consisting merely of earth and sand, built up by teams and scrapers, and in portions reinforced by sandbags. This obstruction is placed from time to time in the river bed, sometimes extending clear across the bed of the stream, but at other times merely part way across, to divert stream flow into the ditch. This dam or obstruction is from time to time washed out and as often replaced. Undoubtedly, the installation of a permanent structure would be a matter of great expense, possibly beyond respondents'

means, as it would have to be heavy and would be dangerous unless carried to such a depth and so buttressed as to resist occasional floods. One point here to be noted, however, is that the washing out from time to time of respondents' dam results in no increase in the consumptive use of water. Any water thus released is simply carried down stream either to serve beneficial uses on the way or, except for minor losses in transmission, eventually to be impounded in appellant city's Lake Hodges Dam farther down the river. None of it flows into the ocean. There is nothing, therefore, in the use of the present diverting dam or structures like it, necessarily to contravene the state's water conservation policy. Appellant's contention in that behalf amounts to a claim that, by building the Sutherland Dam upstream from respondents' lands, appellant is entitled to compel respondents, on pain of not having enough water released from the Sutherland structure for their own diversion, to construct for themselves an otherwise needlessly expensive diversion system. There is no question of unnecessary consumptive use of water by respondents involved. In these circumstances the trial court has found that respondents' method of diversion of water is a reasonable one. The circumstance that appellant would prefer to retain, at the Sutherland Dam, water that might otherwise be released into the river at respondents' point of diversion when the dam there is occasionally washed out, rather than receive the same water again at the Lake Hodges Dam, while it might be a matter to be weighed by the trial court in determining the reasonableness of respondents' method of diverting water, furnishes no ground for upsetting the finding on the subject.

Unless prevented, then, by some devotion of the water supply impounded or to be impounded at the Sutherland Dam to a public use, and in the light of the trial court's finding here that both respondents' use of water and their method of using it are reasonable, it seems plain that they are entitled to such injunctive relief as to adequately protect them in the enjoyment of their rights.

As is said in *Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 374-375 [40 P.2d 486], a case in which the 1928 amendment to article XIV of the Constitution is fully considered and applied:

"There is and should be no endeavor to take from a water right the protection to which it is justly entitled. The preferential and paramount rights of the riparian owner, the owner of an underground and percolating water right, and the prior

appropriator are entitled to protection of the courts at law and in equity. . . .''

The Supreme Court, in that case, goes on to say that a new ''appropriator may use the stream surface, or underground or percolating water, so long as the land having the paramount right is not substantially damaged,'' but that ''any use by an appropriator which causes substantial damage thereto, taking into consideration all of the present and reasonably prospective recognized uses, is an impairment of the right for which compensation must be made either in money or in kind, and, in the event public use has not attached, the owner of the paramount right is entitled to injunctive relief.''

It is true, as noted in this Peabody case (p. 376), quoting from *Waterford Irr. Dist.* v. *Turlock Irr. Dist.*, 50 Cal.App. 213, 221 [194 P. 757] that:

''The mere inconvenience, or even the matter of extra expense, *within limits which are not unreasonable,* to which a prior user may be subjected, will not avail to prevent a subsequent appropriator from utilizing his right.''

The evidence and the findings in this case disclose, however, that appellant city's proceedings result in far more than mere inconvenience and reasonable expense to respondents. The city's proceedings amount, according to the testimony and findings, to wholly depriving respondents of the use of all water of the San Dieguito River except that which comes into it from tributaries below the Sutherland Dam, thus eliminating the flow past respondents' lands by not less than one-half, which, combined with the effect of the present drouth, has, at least for the present, for the most part prevented respondents from using appropriated water to which they have prior and paramount rights, and by excessive lowering of the water table, made difficult and unreasonably expensive respondents' use even of their riparian and overlying rights.

Respondents, therefore, have fully established their right to injunctive relief, unless as we have said, such relief is barred by the intervention of a public use and we are thus brought to consider that phase of the case. In view of the stipulation between appellant city and respondents' counsel, the rights of the parties in that respect are to be treated as they stood on January 30, 1954. Some years prior to that date the electors of the city had voted a bond issue to cover the cost of erecting the Sutherland Dam and acquiring the needed water rights in connection therewith. In 1950 the

state had issued its permit allowing appellant city to appropriate for storage there for the use of its inhabitants water from the Santa Ysabel Creek. There can be no doubt, therefore, that it was prior to January 30, 1954, a matter of public notoriety that the city intended to, and could of right, devote to public use, any water which it might be entitled to retain and impound from the flow of Santa Ysabel Creek.

In these circumstances appellant claims that a public use attached to the Sutherland enterprise either when the bond issue was voted or at least as early as the issuance of the state permit, since it, and the application for it, specifically state it to be "for the purpose of serving the City of San Diego, having a present population of 363,000."

Reliance, *inter alia,* is placed on the language of section 1 of article XIV of the state Constitution to the effect that "the use of all water now appropriated, or that may hereafter be appropriated, for sale, rental or distribution, is hereby declared to be a public use . . . ," and on the language of the Supreme Court in *San Joaquin etc. Irr. Co.* v. *Stevinson,* 164 Cal. 221, 226 [128 P. 924], which preceded the constitutional amendment to the effect that:

"It is settled that the use of water for sale, rental, and distribution to the public generally is a public use."

Our attention is also called to language in the case of *McCrary* v. *Beaudry,* 67 Cal. 120, 121 [7 P. 264], to the effect that "water appropriated for distribution and sale is *ipso facto* devoted to a public use."

It is further urged that respondents here, before acting in defense of their rights, allowed the city's construction of its dam to proceed to completion, and that, therefore, there should be applied the principle announced in *Katz* v. *Walkinshaw,* 141 Cal. 116, 136 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236], that:

"Where the complainant has stood by while the development was made for public use, and has suffered it to proceed at large expense to successful operation, having reasonable cause to believe it would affect his own water supply, the injunction should be refused and the party left to his action for such damages as he can prove."

This language, it may be pointed out, is not even by its terms applicable here, because, although the Sutherland Dam had been substantially completed a month before January 30, 1954, when respondents first moved to protect their rights, it had not yet proceeded to "successful operation," and,

indeed, owing to the drouth, has not even yet done so. However, appellant's argument overlooks one vital element in the situation, namely, that the state permit under which the city operates and under which it alone claims any right to appropriate water from the Santa Ysabel Creek, is by its very terms made subject to "vested" rights, and, therefore, to all riparian, overlying or appropriative rights of respondents. In view, then, of the terms of the permit, respondents, until they had some sort of notice to the contrary, had every right to assume that appellant would observe its terms and refrain from withholding at the Sutherland Dam such waters as respondents were reasonably entitled to have flow down to their lands. This right so to assume respondents continued to have until they observed the cessation of the major part of the flow of the San Dieguito River past their land in consequence of the closing on December 30, 1953, of the Sutherland Dam outlet as hereinbefore noted. On that date the dam was substantially though not fully complete. They were therefore guilty of no laches in permitting the completion of the dam before asserting their rights. In the very next month, with what the trial court must have believed to be reasonable diligence, they proceeded through their representatives to contact appellant city and assert their rights and in due course took measures to protect their interests. Not only, then, did the trial court properly conclude that they were not estopped to seek injunctive relief here, but it must also be held that the issuance to the city of its permit never did and does not now ipso facto result in the attachment of any public use to appellant's appropriation of water, whether contemplated or actual, except to the extent that such appropriation may be in excess of the quantities required to be released in order to satisfy respondents' rights. To hold otherwise would be to hold inoperative the provision of the permit expressly making it subject to vested rights. If, therefore, as to any water de facto appropriated or which may hereafter be de facto appropriated by appellant from the flow of the Santa Ysabel Creek, except out of surplus over what respondents' needs require, such public use can only have attached in the past or attach in the future by a de facto devotion of such nonsurplus water to such public use. Obviously, however, no such de facto devotion could have occurred before December 30, 1953, for practically no water had theretofore been impounded, and certainly none applied to any public use. Nor had any been so applied on or prior to January 30,

1954, as of which date, under the stipulation, respondents' rights are to be measured, for none was diverted from the Sutherland Dam until the following March. Neither can it with confidence be said that any de facto public use of such nonsurplus water has even yet attached, since the only actual use, at least up to the date of the trial, of such water as the city had up to that time impounded, was for the mere purpose of testing the transmission tunnels between the Sutherland and San Vicente reservoirs. In view of all this and of the stipulation in evidence, it must be held that the trial court's conclusion that appellant has no ground for invoking the public use doctrine to bar respondents from injunctive relief was correct.

In this connection a singular situation with respect to the pleadings has developed. Respondents in framing their complaint set out two causes of action, the first asserting their claim for damages incurred for the years 1954 and 1955 from deprivation of water through appellant's operations and seeking judgment for the same and injunctive relief against appellant's continued withholding of water. By way of a second cause of action, respondents set out their claim for the permanent damage to their properties based on the supposition that appellant's withholding of water would continue. In other words, they set out what their claim would be in inverse condemnation. Appellant in answer not only denied the damage alleged in the first cause of action but in answering both causes of action made its denial so broad as to deny its intention to continue to withhold the water claimed by respondents. Accordingly, at the time of trial respondents, in view of that denial, announced that they would proceed only on their first cause of action and would offer no evidence on their second, and in its judgment the court expressly withheld any determination as to the latter. By supplemental complaint respondents asked damages claimed by them to have been incurred for the year 1956, the year in which the action was filed. The existing judgment, therefore, as we have seen, in its award of damages is inclusive then of the three years 1954, 1955 and 1956, in addition to which, it grants the injunctive relief sought.

■■■ Our determination that respondents are entitled to some injunctive relief still leaves for determination the question as to how far such relief should go. Considerable portions of respondents' remaining holdings are also arable and, as has been seen, have riparian or overlying rights or

both. In the natural course of things these will to a greater or lesser extent be added to the areas now irrigated. Appellant makes several objections to the trial court's conclusion that respondents are entitled to have the range of the water table under their lands at from 12 to 20 feet below the surface restored and maintained. It is said in the first place that this would not allow for other land owners than respondents in the valley drawing off water for use on their lands, and, in particular, that it would prevent appellant itself from pumping water for its own lands in the valley which greatly exceed in area those owned by respondents. Mr. Cromwell, however, testified that in his opinion the use of pumped water on appellant's lands, since these lie downstream from those of respondents, would not materially affect the water table under the latter. Furthermore, the evidence shows that the substrata under respondents' lands are of very coarse material, whence it would seem to follow that any drawdown in the water table would be rapidly replaced if only there was adequate water available for spreading. It is further objected that, according to the findings, appellant's withholding of water is only one of the causes for the lowered water table under respondents' lands, the other cause being the present drouth, and that to require the maintenance of the water table at any given level would be to require appellant to insure respondents against a lowering of the water table either by reason of the present or any future drouth.

But it was said in *Hillside Water Co.* v. *City of Los Angeles,* 10 Cal.2d 677, 686 [76 P.2d 681], that:

"The law as announced in the case of *Miller* v. *Bay Cities Water Co., supra,* (157 Cal. 256 [107 P. 115, 27 L.R.A. N.S. 772]) to the effect that the right of an overlying land owner to the percolating water beneath his lands is analogous to the riparian right, has not been changed and has been recognized in the subsequent cases declaring the new law. Thereunder these respondents have had and still have the right to the use of the underground waters in the Bishop cone as a supporting underground water supply available to and for the benefit of their farming operations. It is readily seen that the use of this underground supply as an undersupport for irrigation or other surface uses would minimize the requirements of surface irrigation and result in benefit to the surface soil and crop conditions. *And it may not be rightly said that such use is not a beneficial use of the underground waters."* (Italics ours.)

 In that case the judgment awarding plaintiffs injunctive relief against the city of Los Angeles was reversed for the sole reason that a public use was, in the circumstances there, held to have attached. The plaintiffs were there left, therefore, to seek their damages in inverse condemnation. Not so here. Counsel say that it was the duty of the trial court to find a physical solution, but it is not always that one can be found and the court did not find available any other than the injunctive relief granted. Until and unless some such solution is forthcoming there can apparently be no effective relief to respondents without requiring the reasonable restoration and maintenance of the water table. Even assuming it to be true that the present depression of that table is in part due to the drouth and only in part to appellant's withholding of water, we note that the injunction granted did not require appellant to maintain it at the top of the 12 to 20-foot range found to have prevailed before the Sutherland Dam was built, but merely forbade such impounding as would prevent its depression below the bottom of that range, i.e., 20 feet below the surface. We cannot say that this was an unreasonable requirement. The trial court has retained jurisdiction to grant appropriate relief to any party on a proper evidentiary showing of merit. This reservation is to be interpreted as admitting of modification of the injunctive feature of the judgment if and whenever any other suitable and sufficient physical solution can be devised; or if the particular level required to be maintained in the water table shall be found unworkable.

 There is one other matter to be dealt with in the case. Appellant claims that mileage and witness fees allowed as costs by the trial court to the witnesses Ambs, Juler and Weaver, to whose connection with respondent Southeastern California Association of Seventh-Day Adventists we have already referred, should be disallowed. Admittedly, such fees and mileage are not allowable to parties to the action. No authorities, however, have been cited to the effect that they are to be denied to individuals not shown to have any private interest in the litigation, merely because they are directors or employees of a corporate party.

The judgment is affirmed.

Mussell, Acting P. J., and Shepard, J., concurred.

A petition for a rehearing was denied August 28, 1959, and the following opinion was then rendered:

THE COURT.—Counsel for appellant city of San Diego, in their petition for rehearing, *inter alia*, dispute the sufficiency of the resolution adopted by the city council of that city, a copy of which they set out in their petition, to authorize the city attorney to stipulate with counsel for the respondents that the rights of the latter should be treated as continuing as they stood on January 30, 1954, pending negotiations between the parties for a settlement of their differences. Without retracting anything from our view that in the circumstances respondents were entitled to rely on the stipulation as made, it may nevertheless be pertinent to observe that in order to show themselves entitled to the relief sought they are in fact under no necessity of invoking the protection of the stipulation nor of going back to January 30, 1954, as the date of which their rights are to be considered fixed.

Appellants place excessive emphasis on the trial court's finding that:

"The appropriation of water by the City of San Diego in Sutherland Dam, and the subsequent distribution and sale of a portion thereof was and is a public use."

The appropriation of water referred to in this finding as a public use, being under a state permit which expressly made it subject to vested rights could apply only to surplus water, not to water required to satisfy respondents' reasonable needs, and as we pointed out in our opinion, there has not, so far as the record shows, even yet been actually any substantial service to the public of water from the Sutherland Dam.

We reiterate, therefore, that there is nothing in the claim of devotion of appropriated water to a public use to debar respondents from injunctive relief.

The other points made in the petition for rehearing have been sufficiently dealt with in the opinion as rendered.

Appellant's petition for a hearing by the Supreme Court was denied September 30, 1959. Traynor, J., was of the opinion that the petition should be granted.