CAVALIER MOBILE HOMES, INC. ET AL. *v.* LIBERTY
HOMES, INC.

[No. 280, September Term, 1982.]

*Decided January 5, 1983.*

The cause was argued before MASON, GARRITY and ALPERT, JJ.

*E. Fremont Magee,* with whom were *Thomas E. Plank* and *David H. Bamberger* on the brief, for appellants.

*Edward F. Canfield,* with whom were *Christopher A. Hansen* and *Robert E. Heggestad* on the brief, for appellee.

ALPERT, J., delivered the opinion of the Court.

This appeal from judgments in the Circuit Court for Baltimore County (Raine, C.J. presiding with a jury) involves claims under the Maryland Antitrust Act and for breach of contract. Cavalier Mobile Homes, Inc. ("Cavalier"),[1] a retail seller of mobile homes, charged Liberty Homes, Inc. ("Liberty"), a manufacturer of mobile homes, with participating in a conspiracy, the effect of which was to tie the leasing of mobile home parking spaces to the purchase of mobile homes sold by an alleged co-conspiring retail

---

[1]. Suit was brought in the names of three corporations: Cavalier Mobile Homes, Inc.; Cavalier Mobile Homes East, Inc.; and Cavalier Mobile Homes North, Inc. Noting that Chester Foreman was the sole stockholder and president of all three corporations and that the defendant/appellee treated the three corporations as one entity maintaining three sales locations, the trial judge ruled as a matter of law that they are all one corporation and granted a motion for a directed verdict with respect to counts II and III which were identical to count I except that they were brought in a different corporate name.

seller. Cavalier also alleged that Liberty breached its franchise and distributorship agreements which contained a 30-day notice provision for termination, in that Liberty refused to sell Cavalier a number of mobile homes allegedly ordered after the required 30 days notice had been given. At the end of plaintiff/appellant's case, the trial judge granted a motion to direct the verdict as to the four antitrust counts. The remaining breach of contract claim was submitted to the jury, which returned a verdict in Cavalier's favor in the amount of $30,386. Cavalier appeals from the directed verdicts as to the antitrust claims while Liberty has cross-appealed from the judgment entered on the jury's verdict as to the breach of contract claim.

## I. *The Antitrust Claim*

Appellant raises five issues on appeal. For reasons which will become apparent, we need only decide one of these questions, namely:

3. Did the circuit court err in ruling that there was no evidence from which the jury could infer that Liberty had knowledge of the contracts, combinations and conspiracies between the mobile home park and the mobile home dealer and that Liberty took actions in furtherance of those contracts, combinations and conspiracies?

Inasmuch as our decision on this issue renders moot the remaining issues, we need not and therefore do not reach them.[2]

---

2. The questions presented but not reached are:

1. Did the circuit court err in ruling that there was no evidence from which the jury could infer that contracts, combinations and conspiracies that limited the leasing of vacant mobile home parking spaces in a mobile home park to consumers who purchased mobile homes from a particular dealer constituted unreasonable restraints of trade and illegal tying arrangements in violation of the Maryland Antitrust Act?

2. Did the circuit court err in ruling as a matter of law that Cavalier could not prevail on its antitrust claims because

## The Facts

The mobile homes in which the parties to this action deal, are factory built residences designed to be towed by truck to a lot and set up on large cinder blocks. If the homeowner wishes to move thereafter, he may take his mobile home with him by removing the cinder blocks and attaching the mobile home to a truck. The home may then be towed on its own wheels to a new location.

The record indicates that because of zoning restrictions, consumers in the Baltimore metropolitan area may place their mobile homes only in specially zoned mobile home parks. Additionally, since it has been very difficult to obtain zoning to establish mobile home parks, there is a shortage of available parking spaces. This limitation directly affects the quantity of sales made by retail mobile home dealers since without a properly zoned space to park the mobile home, there generally is no possibility of a sale.

From 1973 through 1976 Liberty entered into annual agreements authorizing Cavalier to sell Liberty homes. The agreement provided that the authorization could be terminated for any reason by either party following 30 days notice. Cavalier asserts that although it was not contained in the written agreement, Liberty granted Cavalier the Baltimore metropolitan area as an "exclusive territory".

In September of 1976, Liberty gave Cavalier notice that it was terminating Cavalier as a Liberty dealer. During the

---

Cavalier's customers were not totally excluded from the mobile home park and because Cavalier was offered the opportunity to join the illegal contracts, combinations and conspiracies, which it declined?

\* \* \*

4. Did the circuit court err in ruling that there was no evidence from which the jury could infer that Liberty's unjustified termination of one of its top dealers and giving a franchise to a competitor who had tied up scarce mobile home lots constituted unfair competition?

5. Did the circuit court err in ruling that there was no evidence from which the jury could infer that Liberty participated in and is liable for civil conspiracy?

same month, Liberty authorized Chesapeake Mobile Homes, Inc. ("Chesapeake"), a competitor of Cavalier, to represent it in the Baltimore market.

The appellant argued that Liberty terminated it as an authorized dealer in order to further a conspiracy to restrain trade in violation of the Maryland antitrust laws. The primary participants in the alleged conspiracy were Chesapeake and the owners of Harford Mobile Village ("Harford"). Harford was a highly desirable mobile home park which first opened in the early 1970's and continued developing in sections through 1977. Harford leased several acres of land in front of the park to Chesapeake for use as a mobile home sales lot. They also entered into agreements wherein a fee plus monthly "rent" was paid by Chesapeake to Harford to reserve vacant lots in the park for Chesapeake's customers. The same deal was offered to other mobile home dealers, several of whom paid to reserve spaces for their customers. In 1975, Harford offered Cavalier 20 lots at the then standard rate, but Cavalier refused to pay the reservation fee. Throughout this period, the record indicates that although Chesapeake had the lion's share of placements within Harford, Cavalier managed to place 47 homes in the park without paying to reserve those spaces, and that a host of other dealers, some of whom paid the reservation fee, also placed homes in not insubstantial numbers.

Cavalier attributes its termination as a Liberty dealer to the realization by Liberty that Chesapeake had valuable unlawful access to Harford which Cavalier maintained was facilitated by an illegal conspiracy. Appellant argued that evidence of meetings in 1976 betwen Chesapeake and Liberty's sales representative indicate that Liberty joined the conspiracy and withdrew from its dealership agreement, thereby damaging Cavalier in two ways: First, by denying it the sales of Liberty mobile homes, and; Second, by participating in the conspiracy to keep Harford a "closed-park." [3]

---

3. A "closed-park" was defined as a park which entered into arrangements in which vacant spaces in the parks are reserved for consumers who

*The Maryland Antitrust Act*

Counts IV, V, VII and VIII of Cavalier's second amended complaint charge Liberty with conspiracy and unfair competition violative of Md. Com. Law Code Ann. § 11-204 (a) (1) and (6) which provide

(a) *Prohibited conduct.* — A person may not:

(1) By contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce;

\* \* \*

(6) Lease or make a sale or contract for the sale of a patented or unpatented commodity or service for use, consumption, enjoyment, or resale, or set a price charged for the commodity or service or discount from or rebate on the price, on the condition, agreement, or understanding that the lessee or purchaser will not use or deal in the commodity or service of a competitor of the lessor or seller, if the effect of the lease, sale, or contract for sale or the condition, agreement, or understanding may:

(i) Substantially lessen competition; or

(ii) Tend to create a monoply in any line of trade or commerce.

Section 11-204 (a) (1) is the Maryland analogue to section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. *Quality Discount Tires, Inc. v. Firestone Tire & Rubber Co.,* 282 Md. 7, 11, 382 A.2d 867 (1978); *Greenbelt Homes, Inc. v. Nyman Realty, Inc.,* 48 Md. App. 42, 48, 426 A.2d 394 (1981). Similarly, section 11-204 (a) (6) is the Maryland equivalent of section 3 of the Clayton Antitrust Act, 15 U.S.C. § 14.

We note that § 11-202 (a) (2) provides that when

---

purchase a mobile home from one of a few select dealers. An "open-park" operates simply on a first come, first served basis, regardless of where the consumer purchased the mobile home.

interpreting the Maryland Antitrust Act, we are to be guided, but not bound, by the construction given the analogous federal statutes by the federal courts. *Cities Service Oil Co. v. Burch,* 29 Md. App. 430, 436, 349 A.2d 279 (1975).

## Application of the Law

Turning to the facts of the case at bar, we find that the appellant appeals from a directed verdict as to the antitrust claims. A directed verdict is inappropriate where there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact which if found to exist would prevent judgment for the moving party. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 328-29, 389 A.2d 887 (1978). All facts and the inferences reasonably deducible therefrom must be considered in the light most favorable to the party against whom the motion for a directed verdict is made. *United Bank & Trust Co. of Maryland v. Schaeffer,* 280 Md. 10, 12, 370 A.2d 1138 (1977). Only when the facts or inferences drawn therefrom lead to but one conclusion is a court justified in directing a verdict. *Snoots v. Demorest,* 254 Md. 572, 255 A.2d 12 (1969); *Smack v. Jackson,* 238 Md. 35, 207 A.2d 511 (1965). Even against this extremely strict standard there are nevertheless circumstances in which a directed verdict is appropriate. Whenever the facts, and any rational inferences which may be drawn from them, point so strongly toward the non-existence of an essential element of a party's cause of action or defense that no reasonable man could find for its existence, the appropriate level of non-persuasion has been reached and a directed verdict is proper.

The trial judge concluded that in order to make out its case under the Maryland Antitrust Act, Cavalier had to establish two essential facts. First, Cavalier would have to put forward proof of a conspiracy or combination between Harford and Chesapeake to "tie" illegally their products. Second, Cavalier would have to establish some participation in the conspiracy by Liberty.

Following a proper review of the facts, the trial judge found that neither fact had been proved sufficiently to withstand the motion for a directed verdict. First, the court found that there was no tie-in because there was no proof of exclusivity.[4] Second, he found the evidence was not legally sufficient to prove that Liberty had knowledge of or participated in an illegal conspiracy. Under the facts of this case, it is the decision regarding the second fact which ultimately determines the outcome. Even if Cavalier had proved that there was an illegal conspiracy between Harford and Chesapeake, without legally sufficient evidence that Liberty had knowledge of or was a participant in the alleged conspiracy, Cavalier cannot prevail.

To establish knowlege of or participation in the conspiracy by Liberty, Cavalier need not show a contract expressly imposing a legal obligation on the part of Liberty to participate or facilitate the conspiracy. The illegal condition, agreement, or understanding (to use § 11-204 (a) (6) language) or the contract, combination or conspiracy (to use § 11-204 (a) (1) terminology) can be implied from the course of dealing between the parties or it may be inferred from all the circumstances. A plaintiff must establish "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139 (1946).

In *Overseas Motors, Inc. v. Import Motors Limited, Inc.,* 375 F. Supp. 499 (E.D.Mich. 1974), *aff'd,* 519 F.2d 119 (6th Cir. 1975), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395 (1975), the court states that "[t]here is a limit, however, to the degree of indirection and innuendo which the law will tolerate.

---

4. Judge Raine relied on McElhenney Co. v. Western Auto Supply Company, 269 F.2d 332 (4th Cir. 1959), in which C.J. Sobeloff stated:

> The gravamen of a Section 3 violation is the forbidden condition, agreement or understanding of exclusivity, and a proper pleading should assert this ultimate fact. It makes no difference whether this is voluntary or is imposed by coercion, but without such agreement, condition or understanding, there can be no statutory infraction. 269 F.2d at 338.

Where . . . the plaintiff's case is based entirely on such circumstantial evidence, the court must be especially vigilant to insure that liberal modes of proof do not become the pretext for unfounded speculation." 375 F.Supp. at 531. Similarly, we stated in *Walker v. Hall,* 34 Md. App. 571, 369 A.2d 105 (1977) that "[i]n order to withstand a motion for directed verdict, the evidence must amount to more than a 'mere scintilla of evidence, amounting to no more than surmise, possibility or conjecture.'" *Id.* at 582.

Chief Judge Raine's oral opinion indicates to this court that he followed this standard. His review of all the evidence in the appellant's case disclosed a dearth of facts relating to knowledge or participation by Liberty in the alleged conspiracy. The appellant showed that in 1976 Liberty, through its sales representative, had frequent meetings with Chesapeake. The testimony indicates only that Liberty's sales representative concluded that Chesapeake could place its customers into Harford. There was no evidence offered from which a rational inference could be drawn which tended to establish the required "meeting of the minds in an unlawful purpose." Neither the court nor the jury can be permitted to speculate as to what transpired at those meetings without some basis in the evidence.[5] The only

---

5. Appellant argues that "the jury could infer that Liberty stopped selling to Cavalier and began selling to Chesapeake so that Liberty could utilize Chesapeake's control of mobile home parking spaces to its own advantage." Liberty unilaterally elected not to do business with Cavalier. This is permissible under the antitrust laws unless it has the proscribed effect on competition, that is, the substantial lessening of competition, or is for the purpose of creating or maintaining a monopoly. U.S. v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465 (1919). This principle has been qualified several times by the Supreme Court. F.T.C. v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429 (1968); Albrecht v. The Herald Co., 390 U.S. 145, 88 S.Ct. 869 (1968); U.S. v. Park, Davis & Co., 362 U.S. 29, 80 S.Ct. 503 (1960); U.S. v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805 (1943). As we read the subsequent applications, however, they have not prohibited a manufacturer from consulting with its new distributor regarding continued sales to a terminated distributor. Quality Mercury, Inc. v. Ford Motor Co., 542 F.2d 466 (8th Cir. 1976); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752 (1970); Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S. App.D.C. 161, 243 F.2d 418 (1957); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D.Md. 1950), *aff'd* 239 F.2d 176 (4th Cir. 1956), *cert. denied,* 355 U.S. 823, 78 S.Ct. 30 (1957).

other evidence arguably related to Liberty's knowledge of the illegal arrangement is that Cavalier may have told Liberty that it was having difficulty in placing homes in Harford. Given these elements of evidence as the only possible proof of Liberty's knowledge of the illegal arrangements, we cannot say that the trial judge erred when he found that Cavalier failed to present sufficient evidence to prove Liberty's knowledge of an unlawful scheme by Harford and Chesapeake, much less that Liberty took any action in furtherance of the alleged conspiracy.

Inasmuch as we agree with the trial court that Liberty was not shown to be a participant in the conspiracy, it is irrelevant to this decision and therefore we do not reach the

---

In a vertical relationship such as between a manufacturer and distributor, the parties cannot do business without an agreement and such an agreement is not evidence of a conspiracy. Moreover, there was such an agreement between Cavalier and Liberty prior to the termination. Certainly, a manufacturer can decide to do business with someone else and there is nothing which leads us to presume that the existence of such an agreement is a violation of the antitrust laws. Even if Liberty, pursuant to an agreement with its new dealer, Chesapeake, refused to continue sales to Cavalier, that does not, by itself, constitute an unreasonable restraint of trade. Schwing Motor Co. v. Hudson Sales Corp., *supra. But see,* Cernuto v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979). In Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267 (1964), *reh'g denied,* 375 U.S. 982, 84 S.Ct. 479 (1964), a brewer allegedly conspired to destroy one distributor's business by terminating its franchise as exclusive distributor of that brewery's products and conducting its business through another distributor. The court held that:

The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. Damage alone does not constitute liability under the Act.

\* \* \*

Unless it can be said that the refusal to deal with . . . [the distributor] had the result of suppressing competition and thus constituted "restraint of trade" within the meaning of Section 1 of the Sherman Act, there is no violation of the Act. 318 F.2d at 287. In Richardson v. Chrysler Motors Corp., 257 F. Supp. 547 (S.D.Tex. 1966), the court after reviewing the case law held that the substitution of one distributor for another is not an unreasonable restraint of trade. Consequently, as there was no evidence of a substantial lessening of competition or that Liberty had "a purpose to create or maintain a monopoly," its refusal to sell to Cavalier was not an act in restraint of trade.

question of whether there was an illegal tying arrangement between Harford and Chesapeake.[6]

It follows from our conclusions above that Cavalier has also failed to produce sufficient evidence in support of its claims based on unfair competition and civil conspiracy. Unfair competition is generally defined in Maryland as, "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods. . . . What constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Baltimore Bedding Corp. v. Moses,* 182 Md. 229, 237, 34 A.2d 338 (1943). Cavalier contends that it presented sufficient evidence from which a jury could infer that the alleged conspiracy among Liberty, Chesapeake, and Harford Mobile Village, and Liberty's termination of Cavalier constituted unfair competition. Since Cavalier failed to present evidence establishing a connection between Liberty and a violation of the antitrust laws, under the facts of this case Liberty's conduct could not constitute unfair competition.

Since common law conspiracy requires collusive conduct to accomplish an unlawful act which injures the plaintiff, *Green v. Washington Suburban Sanitary Commission,* 259 Md. 206, 221, 269 A.2d 815 (1970), the short answer to Cavalier's claim that it was injured by a common law conspiracy

---

**6.** The case of Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc., 101 Cal. App. 3d 532, 161 Cal. Rptr. 811 (Dist. Ct. App. 1980), relied on by appellants is factually inapposite to the instant case. In Suburban, a California appellate court reversed a directed verdict in favor of a mobile home park owner and three mobile home dealers, holding that an agreement between the park owner and the dealers to tie the rental of a substantial number of mobile home parking spaces to the sale of mobile homes by the dealers was an illegal tying arrangement. Significantly, the plaintiff Suburban brought suit against the developer of the mobile home park, and three other mobile home dealers. In the case at bar, suit is against a mobile home manufacturer whose connection to the alleged conspiracy was not proved.

For tying cases generally, *see* Greenbelt Homes, Inc. v. Nyman Realty, Inc., 48 Md. App. 42, 426 A.2d 394 (1981); Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252 (1969); F.T.C. v. Texaco, 393 U.S. 223, 89 S.Ct. 429 (1968); Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514 (1958); Phillips v. Crown Central Petroleum Corp., 602 F.2d 616 (4th Cir. 1979), *cert. denied,* 444 U.S. 1074, 100 S. Ct. 1021 (1980); and Osborn v. Sinclair Refining Co., 286 F.2d 832 (4th Cir. 1960), *cert. denied,* 366 U.S. 963, 81 S.Ct. 1924 (1961).

is that there was insufficient evidence produced to establish that Liberty was engaged in collusive conduct. Accordingly, we affirm the trial judge's ruling granting a directed verdict on Counts IV, V, VII and VIII.

## II. *The Breach of Contract Claim*

Liberty, as cross-appellant, raises three issues:

1. Whether a dealer's claims for breach of an alleged contract for the sale of mobile homes are barred by the statute of frauds, where no evidence was introduced of a writing conforming to U.C.C. § 2-201.

2. Whether, as a matter of law, a seller has reasonable grounds for insecurity under U.C.C. § 2-609, where the buyer has repeatedly made late payments in the past, has failed to improve its payment record after being warned to do so, has been given a 30-day notice of termination, and is in failing financial condition.

3. Whether the jury's verdict (a) that Liberty breached an alleged contract with Cavalier, and (b) that Cavalier suffered damages due to the alleged breach of contract was clearly erroneous, contrary to the great weight of the evidence, and unsupported by the record.

The breach of contract aspect of this controversy arose following· Liberty's September 17, 1976 notice to Cavalier that it was being terminated as an authorized dealer. The distributorship agreement provided for a 30 day "wrapping-up" period which began to run on the date Cavalier was notified of the termination.

What transpired during those 30 days is somewhat murky. Viewed in the light most favorable to the plaintiff/cross-appellee, it appears that Cavalier called Liberty late in September and attempted to order 14 mobile homes. Cavalier's president, Chester Foreman, testified that these homes were for stock and inventory, as well as for prospective customers. He further testified that Liberty

would not accept his order and stipulated that it would accept future orders only if they met certain new conditions. The essence of the new terms was that Liberty would ship to Cavalier only if the home was to satisfy a pre-existing sale by Cavalier to a consumer pursuant to a contract with the customer and that full payment to Liberty in advance or a certified check upon delivery must be assured.

Liberty did, in fact, ship three homes after the termination date which were sold by Cavalier prior to that date. Of the 14 additional homes which Cavalier contends that it attempted to order, it is clear that 13 of them were not under contract. There is apparently a question as to whether one of the fourteen was under such contract.[7] In any event, none of the 14 homes was ever shipped. This failure is the basis for Cavalier's claim that Liberty breached its contract and caused damage to Cavalier in the amount of the lost profits on the 14 homes.

The trial judge overruled Liberty's motion for a directed verdict on this issue and submitted it to the jury. The jury found in Cavalier's favor and judgment was entered against Liberty in the amount of $30,386.

In support of its contention that Liberty was obligated to supply homes to Cavalier, Cavalier produced what it termed a "franchise letter". This letter provided:

> To Whom it May Concern:
>
> Cavalier Mobile Homes, Inc., P.O. Box 887, Glen Burnie, Maryland 21061, is an authorized Liberty dealer for the year of 1976.
>
> They are authorized to sell Liberty products from Liberty Homes, Inc., Leola, Pennsylvania.
>
> This authorization may be terminated by either party given thirty days notice.

---

**7.** Although there was no specific argument before this Court as to the Statute of Frauds implications of the disputed "Skalski home" we believe this issue merits comment. There is a memo in evidence from Liberty to Cavalier in which Liberty indicates that it will not supply Cavalier with this particular mobile home allegedly ordered during the 30-day close out period, because "To do so would be forfeiting our agreement with the new

Because of Liberty's alleged refusal to fill its orders pursuant to this agreement, Cavalier argued that it was entitled to a judgment. This court holds that as a matter of law Cavalier failed to produce evidence of an agreement which complied with the requirements of the Statute of Frauds and consequently there was no enforceable contractual relationship between the parties whereby Liberty was obligated to supply the disputed mobile homes.

Cavalier contends that Liberty failed to raise the Statute of Frauds issue before the trial court and that consequently the issue was not decided by the court below. As a result, Cavalier urges that Liberty should not be permitted to raise this issue on appeal.

In *Lewis v. Hughes,* 276 Md. 247, 251-52, 346 A.2d 231 (1975), Judge Digges speaking for the Court of Appeals stated:

> ... Considering at the outset appellee's Rule 885 contention, it is true that in *Laporte Corp. v. Cement Corp.,* 164 Md. 642, 645-46, 165 A. 195 (1933) our predecessors held that when a defendant pleads the general issue and asks for a directed verdict on the grounds of legally insufficient evidence, without pleading the Statute of Frauds below or objecting to the alleged contract on the basis of it, the statute may not be raised for the first time on appeal. On a motion for reargument in *Laporte,* 164 Md. at 651-53, which is also reported in 168 A. 844 (1933), the Court reaffirmed its decision, declining to follow the rule of prior cases, *e.g., Morgart v. Smouse,* 103 Md. 463, 467, 63 A. 1070

---

dealer." It is arguable that this memo satisfies the Statute of Frauds requirements.

The writing in question does not evidence a contract for the sale of goods. When Cavalier phoned in the order to Liberty, that action constituted an offer. Liberty responded not with an acceptance but instead with a counter-offer containing two required conditions. Cavalier responded by meeting only one of the two conditions. That response constituted a new offer which revoked all prior offers. Liberty's memo rejected the new offer. Thus, there was no contract for the sale of the "Skalski home."

(1906); *Hamilton v. Thirston,* 93 Md. 213, 220, 48 A. 709 (1901); *Semmes v. Worthington,* 38 Md. 298, 317 (1873); *Billingslea v. Ward,* 33 Md. 48, 51 (1870), that the filing of a general issue plea preserves for appeal the question of whether the Statute of Frauds has been satisfied. The decision in *Laporte* was later adhered to by this Court in *Friedman v. Clark,* 252 Md. 26, 31, 248 A.2d 867 (1969) and *Dove v. White,* 211 Md. 228, 234-37, 126 A.2d 835 (1956). *But see Smith v. Biddle,* 188 Md. 315, 318, 52 A.2d 473 (1947).

Neither *Lewis* nor the cases cited therein preclude raising the Statute of Frauds on appeal where the statute has been specifically pleaded as in the instant case.

In *Smith v. Biddle,* 188 Md. 315, 318, 52 A.2d 473 (1947) the Court of Appeals seemed to disregard *Laporte* when it stated:

> Appellee seems to think that Rule 9 of this Court, relating to appeals generally, and Section 40 of Article 5, Code, 1939, bar the appellants from raising in this court matters not presented and argued before the chancellor, but we will pass the matter with the comment that this court will always inquire into the question of whether a contract sought to be specifically enforced is in form that the law requires. Certainly our rule, and the provisions of the code cited, would not bar this court in an inquiry as to whether a contract for the sale of land was violative of the Statute of Frauds, or whether a third party had authority to sign a contract on behalf of the vendor; or whether the contract was so uncertain and duplicitous as to be unenforceable.

Cavalier relies on *Gadekar v. Phillips,* 36 Md. App. 715, 375 A.2d 248 (1977) as authority that Liberty did not preserve the Statute of Frauds issue. In *Gadekar,* the defendant asserted the defense of laches in her amended answer but

failed to pursue that defense during the course of trial. Unlike the procedural defense of laches, the issue of the Statute of Frauds goes to the very heart of Cavalier's claim and Liberty's substantive defense: the existence or non-existence of a valid and enforceable contract. The trial court in overruling Liberty's motion for directed verdict implicitly ruled on this issue by deciding there was legally sufficient evidence of a contract.

The record indicates that the Statute of Frauds issue was presented to the court through the Special Plea and was necessarily decided by the trial court when it denied Liberty's Motion for a Directed Verdict. Assuming arguendo that the issue was not decided below, this court could still consider it under the circumstances of the instant case. *See, Smith v. Biddle, supra,* and also *Tuxedo Cheverly Vol. Fire v. Prince George's County,* 39 Md. App. 322, 327, 385 A.2d 819 (1978). We now consider this question.

The Maryland Uniform Commercial Code, Md. Com. Law Code Ann. § 2-106 (1975) defines "contract for sale" to include both a "present sale of goods and a contract to sell goods at a future time." It follows therefrom that dealership or distributorship contracts fall within the sales provisions of the U.C.C. *Artman v. International Harvester Co.,* 355 F. Supp. 482, 486 (W.D.Pa. 1973). It also follows that the Article II Statute of Frauds, found at § 2-201, applies to such agreements. That section provides in pertinent part:

> [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

The Official Comment to § 2-201, as well as the case law, provides that a writing satisfies the requirements of the Statute of Frauds if: (1) it evidences a contract for the sale of goods; (2) it is signed by the party against whom it is to be enforced; and (3) it specifies the quantity of goods to be sold. *Fortune Furniture Manufacturing Co., Inc. v. Mid South Plastic Fabric Co.,* 310 So.2d 725, 728 (Miss. 1975); *Veik v. Tilden Bank,* 200 Neb. 705, 708, 265 N.W.2d 214 (1978); *Alaska Independent Fishermen's Marketing Association v. New England Fish Co.,* 15 Wash. App. 154, 157, 548 P.2d 348 (1976). The Official Comments describe these requirements as "definite and invariable."

There are three writings in evidence which Cavalier asserts are memoranda of the purported agreement: the dealership letter; the invoices generally; and the termination letter. Each of these, however, fails to overcome the Statute of Frauds and may not be enforced against Liberty with regard to a failure to provide a certain number of homes.

The dealership letter lacks terms as to price and delivery conditions, as well as quantity, which would indicate no contractual obligation on the part of Liberty to supply Cavalier with mobile homes. The arrangement was clearly not a requirements contract. The Statute of Frauds requires that even where the quantity term is not numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirements. *Cox Caulking & Insulating Co. v. Brockett Distributing Co.,* 150 Ga. App. 424, 258 S.E.2d 51 (1979); 3 U.C.C. § 2.04 & n. 27.2 [Bender] (citing cases).

The invoices in evidence indicate a course of dealings between the parties. Our view of this distributorship is that each time Cavalier ordered a home from Liberty, a separate contract of sale was entered into by the parties. This series of contracts, evidenced by invoices, does not indicate that a requirements contract existed, *i.e.,* that there was a contract to fill Cavalier's requirements. Each invoice solely reflects the terms and quantity of individual transactions. There is no indication that quantity is to be measured by

requirements. Accordingly, this course of dealing cannot supply the quantity term to satisfy the Statute of Frauds. *Eastern Dental Corp. v. Isaac Masel Co., Inc.,* 502 F.Supp. 1354, 1364 (E.D. Pa. 1980).

Finally, for the same reasons, the termination letter is not evidence of an agreement between the parties as to quantity. Since Cavalier put forward no competent evidence of a contract for the sale of the 14 disputed mobile homes, the trial court should have held as a matter of law that there was no contract and therefore nothing to go to the jury. Md. Rule 552. It was error for the trial court to deny the motion for directed verdict.

Cavalier asserted that a statement made by Liberty's attorney had the effect of admitting that there was sufficient evidence to go to the jury with regard to the 30 day "winding up" period. We agree with the trial judge's analysis of the statement at issue to the effect that Liberty was "not conceding anything." Additionally, Liberty's attorney renewed its motion for directed verdict at the end of the case, clearly indicating that Liberty was not conceding its right to have the trial judge decide the sufficiency of the evidence.

In conclusion, we shall reverse the trial judge's denial of a directed verdict.

> *Judgments on Counts IV, V, VII and VIII affirmed; judgment on Count I reversed; case remanded to the Circuit Court for Baltimore County with instructions to enter judgment for cross-appellant (Liberty); costs to be paid by appellant-cross appellee (Cavalier).*