[No. H002678. Sixth Dist. May 10, 1989.]

BENTON BOYD, JR., Plaintiff and Appellant, v.
OSCAR FISHER COMPANY, INC., Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 5 and 7.

[REDACTED]

**COUNSEL**

Marc G. Hynes for Plaintiff and Appellant.

David E. Newhouse for Defendant and Respondent.

**OPINION**

**AGLIANO, P. J.—**

## 1. *Introduction*

Plaintiff Benton Boyd, Jr., doing business as Boyd's Photographic Processing Equipment Sales (dealer) appeals from a postjudgment order awarding defendant Oscar Fisher Company, Inc. (manufacturer) attorney fees of $38,730, prejudgment interest of 7 percent from the delinquent date of a number of invoices amounting to $8,652.89, and costs amounting to $17,876.65. Dealer brought this action alleging manufacturer had unjustifiably terminated an exclusive dealership agreement. Manufacturer cross-complained based on unpaid invoices. The jury awarded manufacturer $31,803.46 and gave dealer credit of $10,103.75 for labor and parts, yielding a total judgment for manufacturer of $21,699.71.

Dealer asserts the following alternative claims of error in the awards of fees, interest, and costs. Attorney fees are improper because manufacturer did not prevail on a contract, the contract did not provide for attorney fees, the terms of the contract limited recovery of attorney fees, and the fee award is unreasonable. Prejudgment interest is unwarranted because manufacturer's claims were unliquidated, and the trial court used the wrong method of computing interest. Fees for an arbitrator and expert witnesses are unauthorized because their basis, Code of Civil Procedure section 1141.21, is inapplicable. Witness fees were improperly awarded to manufac-

turer's agents. We conclude below none of these contentions is persuasive and affirm the order as modified.

## 2. *Trial evidence*

There is no issue of the sufficiency of the evidence to support the judgment, but a review is important to understanding the nature of the litigation and the basis for the subsequent award of fees, interest, and costs. ■ "[W]e resolve factual conflicts and draw inferences in support of the verdict." (*Palmer* v. *Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 536 [238 Cal.Rptr. 363].)

Dealer and manufacturer entered into a written agreement dated August 12, 1976, when dealer left manufacturer's employ in Newburgh, New York to relocate in the San Francisco, California area. In five years with manufacturer, dealer had gone from sales into management.

Oscar Fisher Company manufactures stainless steel photographic processing equipment including the Miniscomat, among other things. The Miniscomat, patented in 1969, develops images by pulling resin-coated paper over rolling drums which distribute chemical solutions over one side of the paper. The end result is a printed page. The Miniscomat is useful in photographic typesetting, an industry which grew rapidly in the late 1970's as "cold" type began to replace "hot" type printing. The Miniscomat was originally produced for use with a Merganthaler Linotype machine, but is also compatible with newer photo-typesetting machines.

In the August 1976 agreement, manufacturer granted dealer, as "distributor," an "exclusive franchise" to sell manufacturer's photographic processing equipment in an area with a 200-mile radius centered on San Francisco. Dealer was to receive a commission of 25 percent of the product's list price upon the customer's payment. In exchange, dealer promised, among other things, "Not to purchase, sell, distribute or deal in products which are in competition with the products prepared by" manufacturer. The agreement was in effect for five years, until the end of 1981.

In 1977, dealer sold a Miniscomat which he then used as a demonstration model for other potential customers. Dealer sold about 18 Miniscomats in 1978. Out of 60 Miniscomats manufacturer sold nationwide in 1979, dealer sold 27. Out of 56 Miniscomats manufacturer sold nationwide in 1980, dealer sold 30. Out of 56 Miniscomats manufacturer sold nationwide in 1981, dealer sold 44. Manufacturer had about 25 other distributors nationwide. Dealer also sold paper and chemical supplies not made by manufacturer but needed to operate Miniscomats.

Dealer and manufacturer entered into a second written agreement (dealership agreement) dated February 23, 1982, based on their earlier agreement. Manufacturer granted dealer "an exclusive Dealership to sell and service the Graphic Arts products of" manufacturer in the state of California. The main graphic arts product of manufacturer was the Miniscomat. Dealer was given a discount of 25 percent from list price on "all purchases made by the Dealer" and a credit limit of $35,000. In exchange, dealer promised, among other things, "Not to purchase, sell, distribute or deal in products which are in competition with the products of" manufacturer. Dealer also promised, "All invoices issued to the Dealer from [manufacturer] shall be paid within the terms of payment established by [manufacturer]. For the purpose of this agreement the terms of payment of all invoices shall be 1% 10 Net 45 calendar days." This meant if dealer paid within 10 days, he would get an additional 1 percent discount off the invoice.

Dealer requested that he be billed by manufacturer, rather than collecting his commission after manufacturer was paid. Manufacturer's standard invoice provided for payment within 30 days or imposition of a 1½ percent per month service charge. The dealership agreement extended the time for payment to 45 days to accommodate dealer. Dealer was aware manufacturer's standard invoice also provided: "If referral to a collection agency or an attorney becomes necessary as a result of non-payments cost of collection proceedings including reasonable attorneys fees shall be added to the amount due." Dealer received such invoices when he ordered Miniscomats from manufacturer.

Out of 61 Miniscomats sold by manufacturer nationwide in 1982, dealer sold 53. In early 1982, dealer also began selling a Mohr processor, the Mohrpro 14, which processes resin-coated paper and also film. (As appears below, manufacturer perceived this to be a competitive product.) Dealer's first Mohrpro sale was in April 1982. Over approximately the next 14 months, dealer sold 8 more Mohrs. Out of 44 Miniscomats manufacturer sold nationwide in 1983, dealer sold 20 during the first 9 months.

Dealer did not always pay manufacturer within 45 days of an invoice. He was in constant telephone contact with Robin Horner, manufacturer's sales manager, or Gary Gogerty, manufacturer's assistant sales manager. Dealer sometimes told manufacturer before it shipped a Miniscomat he would be unable to pay in 45 days. On one occasion, dealer sold 22 pieces of equipment at a national graphic arts convention. On other occasions, customers were unsatisfied and would not pay until a Miniscomat was operating properly. Manufacturer frequently complained about late payments. There was no evidence manufacturer ever insisted on receiving interest on dealer's late payments. Complicating their accounting was a substantial amount of

credits due dealer for parts returned to manufacturer. Ordinarily, dealer told manufacturer to which invoice a payment or credit related.

Once in December 1982, when Horner was due to visit from New York, dealer told an employee, Michael Keen, to disassemble a Mohrpro 14 and put it in a dark room at dealer's warehouse.

In February 1983, manufacturer sent a letter to dealer detailing his outstanding account. Manufacturer reviewed dealer's account at the end of its fiscal year on May 31, 1983. In order to bring dealer's account current, manufacturer told dealer to pay for two machines in order to receive one. Dealer did so in June and early July.

In August 1983, dealer advised two potential customers either a Mohrpro 14 or a Miniscomat would suit them.

Dealer's selling of the Mohr processor came to manufacturer's attention in early August when dealer sought reimbursement for advertising in a trade journal. One of the ads identified dealer as selling "two processors that stand above all the rest," namely "the Oscar Fisher Miniscomat RC Processor" for $6,800 and "the Mohrpro 14 RC Processor" for $4,950. Manufacturer's first response in a letter dated August 10, 1983, was to disallow dealer's claim for reimbursement "now that [dealer] is marketing products that are in direct competition of [*sic*] those manufactured by" manufacturer.

On September 23, 1983, manufacturer sent dealer a letter terminating his exclusive dealership due to "dealing in products which are in competition with the products of" manufacturer and "[f]ailure to stay within credit terms as established in Paragraph 2" of the dealership agreement.

On October 17, 1983, dealer sent manufacturer three invoices claiming a total due of $10,103.75, representing 283 hours of labor spent installing a Process-all made by manufacturer at one site, 176 hours of labor spent installing a Miniscomat at another site, and $350 for 7 circuit breakers replaced by dealer. Dealer could not attribute these circuit breakers to any particular machines or invoices of manufacturer.

In March 1984 in response to request for admission number 19, dealer admitted owing manufacturer $31,803.87 on unpaid invoices.

There was a conflict in testimony by dealer, dealer's employee, and others experienced in the graphic arts field about whether the Mohrpro 14 was in competition with the Miniscomat.

### 3. *Procedural History*

Dealer commenced this action with a complaint filed October 17, 1983, alleging manufacturer breached the dealership agreement by repudiating it and also breached an oral agreement of July 1980 to reimburse dealer for advertising and convention expenses. Dealer also alleged manufacturer was intentionally interfering with dealer's contracts and prospective economic relationships by enticing Miniscomat customers away and was unfairly competing by informing potential customers there was another exclusive Miniscomat dealer and dealer would be unable to provide spare parts. Dealer requested compensatory damages, including lost profits, and also injunctive relief.

Manufacturer filed a complaint on cross-complaints, on November 28, 1983, claiming dealer owed $32,326.97 on unpaid invoices for breach of their contract and on an open book account as well as lost profits on competing sales. Dealer filed a purported "cross-complaint" against manufacturer on December 16, 1983, claiming uncompensated labor and parts valued at $10,103.75.

The parties on January 4, 1985, filed a stipulation for judicial arbitration pursuant to Code of Civil Procedure section 1141.10 et seq. which waived the award limit of $25,000. On August 5, 1985, the arbitrator filed an award awarding dealer $57,088.45 plus statutory costs, denying dealer any recovery for labor and parts, and awarding manufacturer $31,803.36 plus 7 percent interest from September 23, 1983, and attorney fees attributable to manufacturer's cross-complaint. On August 15, manufacturer filed a request for trial de novo, purporting to reject the arbitrator's award on "the Complaint only." On August 30, dealer filed a request for trial de novo, rejecting the arbitrator's award "on the Complaint, Cross-Complaint and Cross-Cross-Complaint."

After six days of trial, dealer elected to submit only a breach of contract claim to the jury. The parties stipulated the court would determine a claim for attorney fees by way of posttrial motion. On October 17, 1986, the jury returned the verdict described above and, on October 20, a corresponding judgment was entered.

Manufacturer filed a motion for attorney fees and cost memoranda requesting attorney fees of $60,417 and costs of over $22,000. Manufacturer also filed a motion for an award of prejudgment interest. Dealer opposed these requests. At a hearing on November 26, 1986, the court made the above-described awards of fees and costs.

## 4. *Award of attorney fees*

### A. *Did manufacturer prevail on a contract?*

 Dealer contends attorney fees under Civil Code section 1717 are unavailable because manufacturer did not recover on a contract.

Section 1717 currently provides in part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. . . . [¶] Reasonable attorney's fees shall be fixed by the court . . . . [¶] (b)(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section . . . ." (The law appears to require our application of the current version of the statute, rather than the one in effect when manufacturer moved for fees in the trial court. (*Bank of Idaho* v. *Pine Avenue Associates* (1982) 137 Cal.App.3d 5, 11-13 [186 Cal.Rptr. 695].))

 Recent amendments to section 1717 clarify that upon a party's motion for attorney fees the trial court may have to determine whether the prevailing party prevailed "on the contract." This determination may involve deciding whether a party prevailed on a contract or on a tort theory (*Stout* v. *Turney* (1978) 22 Cal.3d 718, 730 [150 Cal.Rptr. 637, 586 P.2d 1228], and cases there cited; *Perry* v. *Robertson* (1988) 201 Cal.App.3d 333, 344 [247 Cal.Rptr. 74]) or on a combination of theories requiring allocation of fees (*Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124, 129-130 [158 Cal.Rptr. 1, 599 P.2d 83]). Additional complications may arise when there are competing claims on cross-complaints, not all contractual. (Compare *Hughes Tool Co.* v. *Max Hinrichs Seed Co.* (1980) 112 Cal.App.3d 194, 203 [169 Cal.Rptr. 160]; and *Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 37 [161 Cal.Rptr. 516]; with *Plemon* v. *Nelson* (1983) 148 Cal.App.3d 720, 724 [196 Cal.Rptr. 190]; cf. Civ. Code, § 1717, subd. (c).) In resolving a motion for attorney fees, the court should consider the pleaded theories of recovery, the theories asserted and the evidence produced at trial, if any, and also any additional evidence submitted on the motion in order to identify the legal basis of the prevailing party's recovery. (Cf. *Leach* v. *Home Savings & Loan Assn.* (1986) 185 Cal.App.3d 1295, 1307 [230 Cal.Rptr. 553]; but cf. *Jones* v. *Drain* (1983) 149 Cal.App.3d 484, 487 [196 Cal.Rptr. 827]; *Manier* v. *Anaheim Business Center Co.* (1984) 161 Cal.App.3d 503, 508 [207 Cal.Rptr. 508].)

■ Dealer contends this case is like *McKenzie* v. *Kaiser-Aetna* (1976) 55 Cal.App.3d 84 [127 Cal.Rptr. 275], where the trial and appellate courts could not say, absent special jury findings, whether a party prevailed on contract or tort theories. Dealer points out the jury was given instructions on fraud. As manufacturer correctly replies, however, the fraud instructions related to its contention that its cancellation of the dealership agreement was justified by dealer's false promise not to sell competing products and concealment of so doing. (Civ. Code, § 1689.) Manufacturer did not seek or recover damages for fraud. The jury was instructed on competing breach of contract claims. Manufacturer prevailed on a claim of unpaid invoices and therefore was not required to allocate attorney fees to noncontractual causes of action. The trial court did not err in implicitly concluding manufacturer prevailed "on the contract."

B. *Did the contract contain an attorney fee provision?*

■ Dealer contends "the contract" contained no attorney fee provision. The attorney fee provision is found in manufacturer's invoices to dealer and not in their dealership agreement. Dealer's premise is that the invoices are not part of the parties' agreement.

■ Courts will construe together several documents concerning the same subject and made as part of the same transaction (Civ. Code, § 1642; *Mayers* v. *Loew's, Inc.* (1950) 35 Cal.2d 822, 827 [221 P.2d 26]) even though the documents were not executed contemporaneously (*Berg Metals Corp.* v. *Wilson* (1959) 170 Cal.App.2d 559, 567 [339 P.2d 869], and cases there cited) and do not refer to each other (*Cadigan* v. *American Trust Co.* (1955) 131 Cal.App.2d 780, 786-787 [281 P.2d 332], and cases there cited). It is generally a factual question whether several documents were intended to govern the same transaction. (*Id.* at p. 786; *Nevin* v. *Salk* (1975) 45 Cal.App.3d 331, 338 [119 Cal.Rptr. 370].) ■ However, "[i]nterpretation of a contract presents a question of law unless it depends on conflicting evidence, and an appellate court is not bound by a trial court's interpretation which does not depend on the credibility of extrinsic evidence." (*Summit Industrial Equipment, Inc.* v. *Koll/Wells Bay Area* (1986) 186 Cal.App.3d 309, 319 [230 Cal.Rptr. 565]; cf. *Gerdlund* v. *Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270 [235 Cal.Rptr. 279].)

■ Dealer does not dispute manufacturer's contention that their relationship was governed by California's Uniform Commercial Code Sales provisions, Uniform Commercial Code sections 2101 through 2801. Indeed, the majority view is that distributorship and dealership contracts are governed by the Uniform Commercial Code. (*Sally Beauty Co.* v. *Nexxus Products Co., Inc.* (7th Cir. 1986) 801 F.2d 1001, 1005-1006, and cases there

cited; see Annot. (1981) 4 A.L.R.4th 85, § 10, pp. 101-102 and current supp.)

■■■ There is no question the attorney fee provisions apply if each invoice is viewed as a separate contract unrelated to the dealership agreement. (E.g., *Cavalier Mobile Homes* v. *Liberty Homes, Inc.* (1983) 53 Md.App. 379 [454 A.2d 367, 377]; see *Malverne Distributors* v. *Profile Records* (1987) 135 A.D.2d 478 [522 N.Y.S.2d 569, 570].) The Uniform Commercial Code definition of "contract," however, is "the total legal obligation which results from the parties' agreement as affected by this code and any other applicable rules of law." (Cal. U. Com. Code, § 1201, subd. (11).) We therefore consider how the invoices relate to the dealership agreement.

Dealer does not suggest the dealership agreement was intended to be a final and exclusive expression of their agreement. (Cal. U. Com. Code, § 2202.) Uniform Commercial Code section 2207 allows for terms to be added to a contract by its acceptance. "(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: [¶] (a) The offer expressly limits acceptance to the terms of the offer; [¶] (b) They materially alter it; or [¶] (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received." "Between merchants" means a transaction where both parties deal in or are otherwise knowledgeable about goods like those involved in the transaction. (Cal. U. Com. Code, § 2104.)

Substantial evidence supports implicit conclusions that the parties were merchants who added terms to the dealership agreement by subsequent invoices. In the agreement, dealer agreed to pay invoices on terms established by manufacturer. While the agreement gave dealer more time to pay than did the standard invoice, there is nothing in the agreement precluding a supplemental agreement on attorney fees. Dealer acknowledged receiving and reading the attorney fee provision on manufacturer's invoices. Pursuant to Uniform Commercial Code section 2207, subdivision (2), the invoices thus added an attorney fee provision to the parties' original agreement. (Cf. *Kawasho Internat., U.S.A., Inc.* v. *Lakewood Pipe Service, Inc.* (1983) 152 Cal.App.3d 785, 791-793 [201 Cal.Rptr. 640]—interest provision added by sales contracts and invoices; accord, *South Bay Transportation Co.* v. *Gordon Sand Co.* (1988) 206 Cal.App.3d 650, 660 [253 Cal.Rptr. 753]—attorney fee provision added to carrier's contract by signed bills of lading.)

Dealer reads too much into the jury's denial of manufacturer's request to award 18 percent annual interest as its invoices provided. Even if the jury implicitly found this part of the invoices waived by manufacturer's failure

to ask for interest on late payments before this litigation, there is no indication the jury made any implicit finding on the invoice's attorney fee provision. There was no conflicting evidence concerning the meaning of these fee provisions. Under the circumstances, it was and is a question of law for the courts to determine whether the attorney fee provision was part of the parties' contract. We agree with the trial court's implicit conclusion the documents were so related.

### C. *Does the contract limit recovery of attorney fees?*

■ Dealer contends manufacturer's recovery should be limited by the invoice terms to its attorneys' collection efforts and not, for example, to successful efforts to defend against dealer's claims. Although manufacturer's attorneys extensively documented their fee claim, dealer does not identify any particular amount as not involved in manufacturer's collection efforts. We note the trial court awarded $38,730 when over $60,000 was requested. Dealer cites no evidence showing this was not an attempt by the trial court to limit manufacturer's attorney fees to those reasonably expended in collection efforts. Further, substantial evidence supports the trial court's implicit conclusion that any defensive efforts covered by the fee award were interrelated with manufacturer's collection efforts. (*Wagner* v. *Benson, supra,* 101 Cal.App.3d 27, 37.)

Dealer's attempt to limit recovery of attorney fees to manufacturer's collection efforts finds support in the narrow application given an attorney fee provision in *Sciarrotta* v. *Teaford Custom Remodeling, Inc.* (1980) 110 Cal.App.3d 444, 450-452 [167 Cal.Rptr. 889]. However, the Legislature restricted such narrow readings by enacting the following provision of Civil Code section 1717. "(a) . . . [¶] Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the negotiation and execution of the contract, and the fact of that representation is specified in the contract." (Stats. 1983, ch. 1073, § 1, p. 3785; see Legis. Counsel's Dig., Sen. Bill No. 886, Stats. 1983 (Reg. Sess.) Summary Dig., p. 380.) Though this amendment postdates the invoices at issue here, as noted above in part 4A, the current version of section 1717 is applicable. This liberal rule of construction furnished an additional ground for the trial court to award manufacturer's attorneys two-thirds of the fees they requested.

### D. *Is the fee award unreasonably large?*

■ Dealer contends the award of $38,730 for attorney fees is unreasonably large in view of manufacturer's net recovery of $21,699.71. We adopt

the reasoning in *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485 [234 Cal.Rptr. 779], rejecting a similar argument where a fee award of $10,000 was made after a damage award of $9,455. "While the amount of money involved in the litigation is an important factor in determining an award of attorneys' fees, [dealer] cites no authority for the proposition it is a controlling factor. It is not necessarily related to such other factors as the amount of time spent on the case, the complexity of the litigation, the skill and effort required of the attorneys. . . . [¶] . . . Although the award is large in proportion to the amount of damages awarded, it does not shock the conscience but is justified by other factors. Consequently, there was no abuse of discretion in the award." (*Id.* at pp. 1507-1508.)

5. *Award of prejudgment interest**

. . . . . . . . . . . . . . . . . . . . . .

6. *Costs awarded after rejection of arbitration award*

■■■ Dealer contends the trial court erred by failing to tax several items of costs awarded solely pursuant to various subdivisions of Code of Civil Procedure section 1141.21, namely arbitrator's fees of $1,900, expert witness fees of $653, and an expert's fee for computerizing its invoices of $6,695.37. Manufacturer concedes the order erroneously includes $430.38 disallowed by the court and the latter amount should be only $6,274.99.

Code of Civil Procedure sections 1141.10 through 1141.31 provide for judicial arbitration, to which the parties here stipulated. Section 1141.20 provides: "(a) An arbitration award shall be final unless a request for a de novo trial is filed within 30 days after the date the arbitrator files the award with the court. [¶] (b) Any party may elect to have a de novo trial, by court or jury, both as to law and facts. . . ." Section 1141.21 provides: "(a) If the judgment upon the trial de novo is not more favorable in either the amount of damages awarded or the type of relief granted for the party electing the trial de novo than the arbitration award, the court shall order that party to pay the following nonrefundable costs and fees . . . ." ■■■ (Like Civ. Code, § 1717 above, on appeal we apply the current versions of statutes providing for costs. (*Hogan* v. *Ingold* (1952) 38 Cal.2d 802, 814-816 [243 P.2d 1, 32 A.L.R.2d 834]; *Stockton Theatres, Inc.* v. *Palermo* (1956) 47 Cal.2d 469, 477 [304 P.2d 7].))

■■■ Dealer argues his election of a trial de novo 25 days after the arbitration award was filed did not trigger these provisions because

---

* See footnote, *ante,* page 368.

manufacturer had already elected a trial de novo. We are inclined to agree with dealer's premise that manufacturer's election called for a trial de novo of all competing cross-claims due to their interrelationship and not merely "on the Complaint only" as it purported to do. (Compare *Trump* v. *Superior Court* (1981) 118 Cal.App.3d 411, 417 [173 Cal.Rptr. 403] [party could not elect limited trial de novo where related claims on cross-complaints], with *Demirgian* v. *Superior Court* (1986) 187 Cal.App.3d 372, 376-378 [231 Cal.Rptr. 698] [party could elect limited trial de novo on independent claim].) However, it does not follow that dealer's subsequent election of a trial de novo should be ignored. Nothing in the judicial arbitration statutes precludes more than one party per arbitration from electing a trial de novo. Where two or more do so, each should be subject to the discouraging prospect of liability for costs if unsuccessful in the trial de novo. (Cf. *Demirgian, supra,* at p. 376.)

Dealer relies on *Rabinowitch* v. *Cal. Western Gas Co.* (1967) 257 Cal.App.2d 150 [65 Cal.Rptr. 1], as barring recovery for an audit of manufacturer's invoices. At the time of that decision, there was no statutory definition of costs and precedent had established only a court-appointed expert's fees were recoverable. (*Id.* at pp. 161-162.)

Code of Civil Procedure section 1141.21, subdivision (a)(iii), enacted in 1978, specifically provides for recovery of "the reasonable costs of the services of expert witnesses, who are not regular employees of any party, actually incurred or reasonably necessary in the preparation or trial of the case." Subdivision (a)(iv) authorizes recovery of "the compensation paid by the other party or parties to the arbitrator." These subdivisions provide a statutory basis for manufacturer's recovery of expert fees and payment to the arbitrator. Dealer recognizes, "The nonrefundable costs and fees identified in CCP § 1141.21 are in excess of those normally allowed under CCP § 1032 . . . ."

Dealer further contends manufacturer failed to sustain its burden of proving these costs, citing *State of California* v. *Meyer* (1985) 174 Cal.App.3d 1061, 1075 [220 Cal.Rptr. 884]. Since manufacturer provided sufficient evidence its computerization expert charged $6,000 for his services, the trial court need not have been detained by dealer's bare objection such fees were excessive and unnecessary.

 Dealer also contends the trial court erred in not taxing $6,665 in witness fees and mileage for Gary Gogerty, Robin Horner, Oscar Fisher, and Michael Keen. Keen was originally dealer's serviceman, later an independent contractor, and later dealer's replacement as manufacturer's exclusive dealer. The others are manufacturer's officers.

On appeal, dealer acknowledges it is appropriate to award witness fees to employees and officers of a corporate party who do not have a personal interest in the litigation (*Trussell* v. *City of San Diego* (1959) 172 Cal.App.2d 593, 617 [343 P.2d 65]; *County of Kern* v. *Ginn* (1983) 146 Cal.App.3d 1107, 1112 [194 Cal.Rptr. 512]), but asserts the above-named witnesses do not fit into this category. The law seems to allow costs where corporate agents are more like witnesses and not where they are more like parties. (See generally Annot. (1958) 57 A.L.R.2d 1243.)

This contention is not properly before us. In the trial court, dealer only objected to manufacturer's claim for witness fees to the extent they exceeded the statutory amount and the court taxed them accordingly. (Code Civ. Proc., §§ 1033.5, subd. (a)(7), 1141.21, subd. (a)(ii); Gov. Code, § 68093.) "The law is clear that a motion to tax costs must state the grounds of the objection; any not stated are waived. (*Mojave and Bakersfield Railroad Company* v. *Cuddeback* (1915) 28 Cal.App. 439, 441-442 . . . .)" (*Staples* v. *Hoefke* (1987) 189 Cal.App.3d 1397, 1409 [235 Cal.Rptr. 165]; cf. *Pratt* v. *Robert S. Odell & Co.* (1944) 63 Cal.App.2d 78, 83 [146 P.2d 504].)

Dealer has identified no trial court error in the award of fees for the arbitrator, experts, or other witnesses.

7. *Effect of bankruptcy**

. . . . . . . . . . . . . . . . . . . . .

8. *Disposition*

The postjudgment order awarding attorney fees, interest, and costs to manufacturer is modified to reflect a reduced award for expert computerization of $6,274.99, and is affirmed as so modified. Manufacturer is entitled to attorney fees and costs on appeal in an amount to be fixed by the trial court.

Premo, J., concurred.

**BRAUER, J.,** Concurring and Dissenting.—I join in the opinion of the court except as to part 6. My disagreement with that part also affects the disposition.

The cross-complaints in this case were clearly compulsory ones as they arose "out of the same transaction, occurrence, or series of transactions or

---

*See footnote, *ante,* page 368.

occurrences" as plaintiff's causes of action (Code Civ. Proc., §§ 426.10, subd. (c), 426.30). Therefore, manufacturer's demand for trial de novo after arbitration "on the complaint only" resulted in the submission of the entire cause to judicial re-evaluation. (*Trump* v. *Superior Court* (1981) 118 Cal.App.3d 411, 417 [173 Cal.Rptr. 403].) It follows that dealer's subsequent demand was an idle and superfluous act; and Code of Civil Procedure section 1141.21, subdivision (a) did not come into play because dealer was not "the party electing the trial de novo." I would hold that the trial court should have taxed the cost items attributable to the arbitration.